## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| LESLIE KATZ, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>         - against -<br><br>CATAMARAN CORPORATION, MARK A. THIERER, STEVEN D. COSLER, PETER J. BENSEN, WILLIAM J. DAVIS, STEVEN B. EPSTEIN, BETSY D. HOLDEN, KAREN L. KATEN, HARRY M. KRAEMER, and ANTHONY MASSO,<br><br>                              Defendants. | Case No. 15-cv-4513<br><br><br><br><br><br><br><br><br><br><br>**Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

Plaintiff, Leslie Katz, by his attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters derived from, *inter alia*, counsel's review of documents filed with the U.S. Securities and Exchange Commission ("SEC"), press releases issued by Defendants, and publicly available news sources:

### SUMMARY OF THE ACTION

1.      This is a shareholder class action against the members of the Board of Directors (the "Board") of Catamaran Corporation ("Catamaran" or the "Company") and against the Company for violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78n(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9, for filing a materially misleading preliminary proxy (the "Preliminary Proxy") with the SEC on May 11, 2015, and against the members of the Board under Section 20(a) of the Exchange Act,

15 U.S.C. § 78t, in connection with the proposed acquisition (the "Transaction") of Catamaran by UnitedHealth Group Incorporated ("UnitedHealth") pursuant to an Arrangement Agreement (the "Arrangement Agreement") entered into on March 29, 2015. This action is brought on behalf of a class of all Catamaran shareholders who will be asked to vote upon the Transaction pursuant to a materially false and misleading proxy (the "Class," "Class Members").

2.      The proposed Transaction, which was approved by the Board and publicly announced on March 30, 2015, provides that Catamaran shareholders will receive $61.50 in cash for each share of Catamaran stock they own, and that Defendant Mark A. Thierer ("Thierer") will become the chief executive officer of OptumRx, UnitedHealth's pharmacy care service business; and Jeff Park, Catamaran's Executive Vice President, Operations ("Park"), will become the chief operating officer. It further provides that the individual defendants (the "Director Defendants") will receive a total of $4,160,738 in vested stock options and other remuneration, and that senior management of Catamaran will receive a total of $99,846,903 in vested stock options and other remuneration.

3.      The Transaction was entered into without the Company first being properly shopped, and the consideration being offered to shareholders is unfair and inadequate, and less than the at least $64.50 to $67.50 per share bid that was offered by another potential bidder, but which the Director Defendants failed to properly pursue given their own self-interests and that of the Company's senior management.

4.      The Director Defendants are now seeking to consummate the unfair Transaction by way of the materially false and misleading Preliminary Proxy.

5.      The Preliminary Proxy, which was approved by the Board, is materially false and misleading for reasons including that it: (a) falsely states that a potentially superior bid for the

Company made by a party identified only as "Party 3" in the Preliminary Proxy, which made a preliminary bid of between $64.50 to $67.50 per share, did so without knowing about certain client losses (and therefore ultimately may not have been pursued at that level), when in fact, that information was publicly available weeks before this bid was made; (2) fails to disclose and, therefore, materially omits the Company's 2014 EBITDA, or earnings before interest, taxes, depreciation and amortization, and includes the EBITDA contribution of certain acquisitions but not others made during 2015, which is then used as the basis for numerous statements in the Preliminary Proxy (3) makes materially false and misleading statements based upon an intentionally and falsely deflated estimated 2015 EBITDA for the Company, which accounts for growth of only 6.2% when the Company experienced historical revenue growth of 46-49% for 2014 and 2013, respectively, and an average of over 61% for the past three years, making both the analysis performed by Blackstone Advisory Partners, L.P. (Blackstone"), and any summary or discussion of the fairness opinion ("Fairness Opinion") or its underlying analysis by Blackstone, as well as any recommendation of the Transaction based upon the Fairness Opinion, materially false and misleading and without a reasonable basis.

6.  The Preliminary Proxy is additionally false and misleading in that it fails to disclose: (1) whether other parties which either bid or were interested in bidding offered Thierer and Park continued employment and, if so, on what terms; (2) when in the bidding process such employment was offered by UnitedHealth to Thierer and Park and on what terms; and (3) omits material information in the "Summary of Financial Analysis" including, but not limited to, the following: (a) with respect to the Blackstone Discounted Cash Flow Analysis ("DCF" Analysis), how the terminal values and discount rates were derived; (b) with respect to the Selected Companies Analysis: (i) the metrics for the selected companies; (ii) the Wall Street analysts

relied upon and when they opined; and (iii) how the representative range of multiples were applied to the Company's EBITDA; (c) with respect to the Selected Precedent Transactions, the metrics for the selected transactions, how the range of multiples were determined and the Company metrics to which these multiples were derived; and (d) any information with respect to the Equity Analyst Price Target Analysis, relied upon by Blackstone.

7.     The Preliminary Proxy, once it becomes final, will be used to solicit a shareholder vote approving the Transaction upon unfair terms and for inadequate consideration of up to $6.00 per share, which will cause damage to Class members if the vote is not enjoined unless and until a full and accurate proxy is disseminated.  Therefore, the Preliminary Proxy and the ensuing vote will be the direct cause of damage to the Class and Class Members.

8.     Plaintiff seeks to enjoin the Transaction until a  proxy disclosing all relevant material information is disseminated to Plaintiff and other members of the Class.

## THE PARTIES

9.     Plaintiff is, and has been at all relevant times, the owner of common stock of Catamaran.

10.     Defendant Catamaran is a corporation incorporated under the Business Corporations Act of the Yukon Territory, Canada (the "YBCA"), with its principal place of business and executive offices located at 1600 McConnor Parkway, Schaumburg, Illinois 60173-6801.  Catamaran's common stock is traded on NASDAQ under the symbol "CTRX."

11.     Defendant Thierer has been a director of the Company since January 2006. Effective March 9, 2011, Thierer assumed his current role of Chairman and Chief Executive Officer ("CEO") of the Company.  Previously, he served as the President and Chief Operating

Officer of the Company from September 2006 through June 2008 and President and CEO of the Company from June 30, 2008 through March 8, 2011.

12.    Thierer's compensation for 2014 totaled $14,787,000 (base salary of $1,200,000; stock awards valued at $9,909,000; option awards valued at $1,715,000, Non-Equity Incentive Plan Compensation of $1,925,000, and "all other compensation" valued at $38,000).   Thierer was awarded 110,844 options and 44,340 time-based Restricted Stock Units ("RSUs").   In addition, 75,652 performance-based RSUs vested at the end of 2014.  As of the end of fiscal year 2014, Thierer held 235,295 shares or units of stock that have not vested, 248,877 securities underlying unexercised/unexercisable options, and 77,337 securities underlying unexercised/exercisable options.  In addition, 75,652 performance-based RSUs vested at the end of 2014 for achievement of specific financial results of the Company for the cumulative three year period from 2012 to 2014.  Pursuant to the Company's employment agreement with Thierer, upon a "change of control," the definition of which encompasses consummation of the proposed Transaction, Thierer's unvested options and RSUs will vest in full.

13.    Defendant Steven D. Cosler ("Cosler") has been a director of the Company since August 2007, and was appointed Lead Independent Director on March 9, 2011.  Cosler is a member of the Board's Nominating and Corporate Governance Committee.   Cosler's compensation for 2014 totaled $343,276 ($155,000 in cash; $188,276 in stock awards).  As of December 31, 2014, Cosler had 5,000 aggregate option awards outstanding and 5,832 aggregate RSU awards outstanding.

14.    Defendant Peter J. Bensen ("Bensen") has been a director of the Company since December 2011.  Bensen is a member of the Board's Compensation Committee.  Bensen's

compensation for 2014 totaled $278,276 ($90,000 in cash; $188,276 in stock awards). As of December 31, 2014, Bensen had 5,832 aggregate RSU awards outstanding.

15.     Defendant William J. Davis ("Davis") has been a director of the Company since January 2007. Davis is a member of the Board's Audit Committee. Davis's compensation for 2014 totaled $283,276 ($95,000 in cash; $188,276 in stock awards). As of December 31, 2014, Davis had 5,832 aggregate RSU awards outstanding.

16.     Defendant Steven B. Epstein ("Epstein") has been a director of the Company since August 2012. Epstein is a member of the Board's Nominating and Corporate Governance Committee. Epstein's compensation for 2014 totaled $268,276 ($80,000 in cash; $188,276 in stock awards). As of December 31, 2014, Epstein had 5,832 aggregate RSU awards outstanding.

17.     Defendant Betsy D. Holden ("Holden") has been a director of the Company since December 2012. Holden is a member of the Board's Audit Committee and the Nominating and Corporate Governance Committee. Holden's compensation for 2014 totaled $278,276 ($90,000 in cash; $188,276 in stock awards). As of December 31, 2014, Holden had 5,832 aggregate RSU awards outstanding.

18.     Defendant Karen L. Katen ("Katen") has been a director of the Company since December 2012. Katen is a member of the Board's Compensation Committee. Katen's compensation for 2014 totaled $270,276 ($82,500 in cash; $188,276 in stock awards). As of December 31, 2014, Katen had 5,832 aggregate RSU awards outstanding.

19.     Defendant Harry M. Kraemer ("Kraemer") has been a director of the Company since July 2012. Kraemer is a member of the Board's Audit Committee. Kraemer's compensation for 2014 totaled $273,276 ($85,000 in cash; $188,276 in stock awards). As of December 31, 2014, Kraemer had 8,458 aggregate RSU awards outstanding.

20.     Defendant Anthony Masso ("Masso") has been a director of the Company since September 2007.  Masso is a member of the Board's Compensation Committee.  Masso's compensation for 2014 totaled $270,776 ($82,500 in cash; $188,276 in stock awards).  As of December 31, 2014, Masso had 5,832 aggregate RSU awards outstanding.

21.     The Defendants named in paragraphs 11 through 20 above are collectively referred to as the "Director Defendants," and with the Company, are collectively referred to as the "Defendants."

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action under federal question jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States.  This Court has exclusive jurisdiction pursuant to Section 27 of the Exchange At, 15 U.S.C. §78aa, because this action asserts claims under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a).  The Court has personal jurisdiction over each Defendant because the Company is either a corporation that conducts or has transacted business in and/or maintains operations in this District and the Director Defendants are individuals who are either present in this District for jurisdictional purposes or have sufficient minimum contacts with this District by way of the business they conduct with the Company, as to render the exercise of personal jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper pursuant to 28 U.S.C. § 1391 because Catamaran's principal place of business is in this District and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), individually and on behalf of all other holders of Catamaran common stock who will vote on the Transaction, (the "Class").  Excluded from the Class are Defendants, and to the extent that they are individuals, their immediate family members, affiliates, heirs, assigns, and agents, and officers of Catamaran; with respect to Catamaran, its parent companies and subsidiaries, and any related or affiliated person, firm, trust, corporation, or other entity. This Action is properly maintainable as a class action for the following reasons:

a)     The Class is so numerous that joinder of all members is impracticable.  As of May 11, 2015, there were over 208 million shares of Catamaran common stock outstanding, likely held by hundreds, if not thousands, of  beneficial owners.

b)     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include, *inter alia*, the following:

i.     whether the Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9;

ii.     whether the Director Defendants violated Section 20(a) of the Exchange Act; and

iii.     whether Plaintiff and the other members of the Class will be irreparably damaged if Defendants are not enjoined from the misconduct described herein.

25.     The claims of Plaintiff are typical of the claims of the other members of the Class in that all members of the Class will be damaged alike by the wrongs complained of herein.

26.     This class action is a fair and efficient method of adjudicating the claims of Plaintiff and the other Class members for the following reasons:  (a) common questions of law

and fact predominate over any question affecting any individual Class member; (b) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, thereby establishing incompatible standards of conduct for Defendants or would allow the claims of some members of the Class to adversely affect other Class members' ability to protect their interests, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; (c) this forum is appropriate for litigation of this action since a substantial portion of the transactions, acts, events, and omissions alleged herein occurred in this District; (d) Plaintiff anticipates no difficulty in the management of this action as a class action; and (e) the Class members are readily definable, and prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims that may be too small to support the expense of individual, complex litigation.

27.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff is an adequate representative of the Class.

28.     Defendants have acted and will continue to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

29.     For these reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**<u>BACKGROUND AND SUBSTANTIVE ALLEGATIONS</u>**

30. Catamaran is a leading provider of pharmacy benefit management ("PBM") services and healthcare information technology ("HCIT") solutions to the healthcare benefit management industry. Catamaran conducts its business primarily in the United States. For the years ended December 31, 2014, 2013 and 2012, the Company recognized nearly all of its revenue in the United States, with an immaterial amount earned in Canada.

31. Catmaran's product offerings and solutions combine a range of applications and PBM services designed to assist its customers in reducing the cost and managing the complexity of their prescription drug programs. Catamaran operates mail pharmacy facilities in Indiana, Florida, Ohio and Texas, and specialty pharmacies in Alabama, Georgia, Kansas, Louisiana, Maine, Massachusetts, Mississippi, Nevada, Tennessee, Texas, Indiana, and West Virginia.

**The Arrangement Agreement**

32. In a press release filed with the SEC on March 30, 2015 as part of a Form 8-K, which is incorporated by reference in the Preliminary Proxy, Catamaran announced that on March 29, 2015, it entered into the Arrangement Agreement with UnitedHealth and 1031387 B.C. Unlimited, an entity to be used to effect the Transaction. The Form 8-K attached the Arrangement Agreement as an exhibit thereto.

33. The Arrangement Agreement provides, among other things, that, in accordance with a "Plan of Arrangement," UnitedHealth will acquire, directly or indirectly, all of the issued and outstanding common stock of Catamaran pursuant to a statutory "arrangement" under Section 195 of the YBCA, resulting in Catamaran becoming an indirect, wholly owned subsidiary of UnitedHealth.

34. Pursuant to the Arrangement Agreement, each holder of Catamaran common stock immediately prior to the consummation of the Arrangement who has not exercised and

perfected dissenter rights will receive $61.50 in cash for each share of Catamaran common stock owned by such holder. The proposed Transaction is valued at approximately $12.8 billion and purportedly offered Catamaran shareholders a 27% premium over the unaffected trading price of Catamaran shares on March 27, 2015.

35.     In a joint statement released by Catamaran and UnitedHealth, they stated that Catamaran will be combined with OptumRx, UnitedHealth's pharmacy unit. Catamaran and OptumRx are expected to officially become one company in the fourth quarter of 2015. The newly combined company's name will be OptumRx. Director Defendant Thierer will be the new CEO of OptumRx and Park, Catamaran's Chief Financial Officer, will become its Chief Operating Officer.

36.     The proposed Transaction is expected to close in the fourth quarter of 2015. The proposed Transaction will be submitted to the shareholders of Catamaran for their consideration and approval pursuant to the final version of the Preliminary Proxy.

**The Individual Defendants' Conflicts of Interest**

37.     The Director Defendants unanimously approved the Arrangement Agreement and the proposed Transaction notwithstanding their own financial interest in its consummation, particularly that of Thierer who will retain his position with the new company.

38.     Each Director Defendant's outstanding stock options granted before January 1, 2014 will vest and entitle each Director Defendant to receive the Transaction consideration of $61.50 per share of Catamaran stock.

39.     Upon consummation of the proposed Transaction, Thierer will become the new CEO of the combined company, OptumRx. Moreover, pursuant to his employment agreement

with the Company, Thierer's unvested options and RSUs will vest in full upon a "change of control," which the consummated Transaction would constitute.

40.     Upon consummation of the Transaction, Park will serve as Chief Operating Officer of the combined OptumRx/Catamaran.   Park's compensation from the Transaction, including vested stock options and golden parachutes, will total $18,774,825.   *See* Preliminary Proxy at 67.

41.     The Company's senior management, and the persons who are driving the Transaction at what amounts to an inadequate price, as further discussed below, are to obtain millions of dollars in remuneration

42.     Officers' compensation from the Transaction, including vested stock options ($16,568,719) and golden parachutes ($83,278,184), totals $99,846,903.   *See* Preliminary Proxy at 63, 67.

43.     Upon consummation of the Transaction, each Director Defendant's outstanding stock options granted before January 1, 2014 will vest and entitle each to receive the Transaction consideration of $61.50 per share of Catamaran stock.   The Director Defendants' total consideration for equity awards amounts to $4,160,738.   *See* Preliminary Proxy at 63.

     **(a) Relevant Background of the Transaction**

44.     The background of the Transaction leaves little doubt that the Transaction was driven and negotiated by Thierer and Catmaran's senior management, those who have the most to personally gain from the Transaction, who left a potentially superior offer for the Company at between $64.50 to $67.50 per share on the table in order to take the deal with UnitedHealth.

45.     According to the Preliminary Proxy, a potential sale of Catamaran by UnitedHealth was not even on the horizon when discussions first commenced between Thierer

and Dirk McMahon ("McMahon"), then CEO of OptumRx, to discuss ways in which those two companies could work together. In fact, the initial discussion concerned primarily a technology transfer or a license to OptumRX of the source code to certain Catamaran technology or a combination of OptumRX and Catamaran.

46.     In late July 2014, Thierer brought in Blackstone to assist Catamaran with evaluating the proposed combination transaction with OptumRx.

47.     Thereafter, in September 24, 2014, Thierer, Park, and Michael Shapiro ("Shapiro"), Catamaran's Senior Vice President and Chief Financial Officer, met with Steve Hemsley ("Hemsley"), CEO of UnitedHealth; David Wichmann ("Wichmann"), President and Chief Financial Officer of UnitedHealth; Larry Renfro ("Renfro"), Vice Chairman of UnitedHealth and CEO of Optum, and McMahon, "to discuss the commercial merits of combining the Catamaran and OptumRx businesses, the potential synergies relating to a business combination that were identified during the clean room review and the benefits of the proposed combination transaction." *See* Preliminary Proxy at 34.

48.     It was not until December 2014, that Wichmann and Renfro "indicated that UnitedHealth Group was considering making an offer to acquire Catamaran with a combination of cash and stock consideration." *Id.*

49.     On December 22, 2014, Thierer and Shapiro met with Wichmann and Renfro. During the meeting, Wichmann and Renfro orally communicated a proposal for OptumRx (or one of its affiliated entities) to acquire Catamaran for total nominal consideration of $54.50 per share, consisting of a majority in cash and the remainder in stock of a new subsidiary of UnitedHealth to be combined with Catamaran. Under this proposed transaction structure, UnitedHealth and shareholders of Catamaran would hold 85% and 15% of the outstanding shares

of the new subsidiary.  *See* Preliminary Proxy at 36.  Based upon a preliminary analysis by Blackstone, which is not disclosed in the Preliminary Proxy, and after a number of meetings, including one in which UnitedHealth indicated that it could offer between $60-61 in cash, Thierer telephoned Wichmann and orally communicated the counteroffer on the terms discussed with the Board, an all-cash transaction at $65 per share or a cash and subsidiary stock transaction for total nominal consideration of $62.50 per share, consisting of $53.125 in cash and 10.5% stock in the new subsidiary.  Wichmann rejected the counteroffer.  *See* Preliminary Proxy at 37.

50.     Thierer, on behalf of the Company, continued negotiations with UnitedHealth.At the same time,  the Board determined to reach out to a limited universe of counterparties to see whether the Company could obtain a better price.

51.     By early February 2015, the Board authorized Blackstone to contact the two parties referred to in the Preliminary Proxy as "Party 1" and "Party 2."  *See* Preliminary Proxy at 36-37.

52.     On February 11, 2015, The Board approved contacting two additional parties, referred to in the Preliminary Proxy as "Party 3" and "Party 4."  On February 13, 2015, Blackstone contacted Party 3 and Party 4 to inquire whether they would be interested in a possible business combination transaction with Catamaran.  *See* Preliminary Proxy at 37.

53.     On February 16, 2015, Wichmann advised Thierer that UnitedHealth would no longer pursue the cash and stock transaction but would be willing to proceed with an acquisition of Catamaran for total consideration of $61 per share, consisting of cash and shares of UnitedHealth stock. Thierer rejected the counteroffer, noting that the Board had considered the possibility of a $61 per share all cash proposal at its February 8 meeting and was unwilling to complete a transaction at $61 per share.

54.     On February 17, 2015, Thierer requested that UnitedHealth increase its offer. *See* Preliminary Proxy at 37.

55.     Thereafter, Party 4 notified Blackstone that it had determined not to pursue a possible transaction, and the Board authorized the distribution of the draft agreement to Parties 1, 2 and 3 and they were granted access to the Company's due diligence room. *See* Preliminary Proxy at 38.

56.     Although the ostensible purpose of contacting additional parties was to spark a bidding war, instead, in February 2015, Catamaran sent Parties 1, 2 and 3 an onerous draft arrangement with terms far beyond those being discussed with UnitedHealth, which was clearly directed at skewing any bidding process. That agreement first and foremost required that these other parties pay a 10% break up fee—a level far beyond any that is acceptable in current merger negotiations, and agree to a "hell or high water" provision, meaning that those parties would divest themselves of any parts of their business that would present an antitrust problem. The draft arrangement agreement further contemplated an all-cash transaction, with an additional "ticking fee" payable in cash if the closing occurs more than six months after the date of the definitive agreement due to the failure to obtain antitrust regulatory approvals.

57.     At the same time, Wichmann delivered a letter to Thierer with a revised non-binding offer for OptumRx (or one of its affiliated entities) to acquire Catamaran increasing its offer to $61.50 per share, with at least 80% of the consideration payable to Catamaran shareholders consisting of cash and up to 20% consisting of shares of UnitedHealth common stock at a fixed exchange ratio; a standard no-shop provision and exclusive negotiations between Catamaran and UnitedHealth.

58.     Give the onerous terms of the draft agreement, as intended, on February 25, 2015, Party 1 notified Blackstone that it had determined not to pursue a possible transaction and withdrew from the process.  .

59.     On February 27, 2015, after a meeting, the Board authorized management to respond to UnitedHealth with a counter-proposal that would provide a fixed value collar for a specified percentage of the stock portion of the consideration and a "break-up" fee in the amount of 2.5 to 3.0% of the aggregate equity value of Catamaran, which was done.  *See* Preliminary Proxy at 39.

60.     During subsequent negotiations, UnitedHealth representatives insisted that the break-up fee remain at 3.5% of Catamaran's aggregate equity value.  The parties determined to commence the drafting of an initial arrangement agreement, though two other parties were still considering bids and UnitedHealth had failed to offer a fair price for the Company.

61.     Given the onerous terms of the draft agreement, on March 4, 2015 outside counsel to Party 3 sent Blackstone a list of material issues raised by the Company's initial February 24 draft arrangement agreement.  In the list, Party 3:  (i) rejected the "hell or high water" covenant to take all actions necessary to obtain required antitrust regulatory approvals, and suggested that it would be willing to consider potential divestitures and limitations; (ii) rejected the 10% reverse break-up fee for failure to obtain the required antitrust regulatory approvals, and suggested that it would be willing to consider an unspecified reverse break-up fee at a more reasonable level; (iii) rejected the "ticking fee" payable if the closing occurs more than six months after the date of the definitive agreement due to the failure to obtain antitrust regulatory approvals; (iv) proposed a 4.0 to 4.5% break-up fee; and (v) added additional closing conditions.  *See* Preliminary Proxy at 40.

62.     Similarly, Party 2 informed Blackstone that, while they remained interested in pursuing a possible business combination with Catamaran, they would not be in a position to submit a preliminary non-binding proposal or issues list in response to the Company's initial draft arrangement agreement by the arbitrarily imposed deadline of March 5, 2015. *See* Preliminary Proxy at 40-41.

63.     On March 5, 2015, Party 3 delivered a letter to Blackstone with a preliminary non-binding proposal to acquire Catamaran, subject to the negotiation of a definitive agreement with Catamaran and completion of confirmatory due diligence, in an all-cash transaction for a range between $64.50 to $67.50 per share. In the letter, Party 3 noted that it would require additional information from Catamaran with respect to, among other things, key contract terms, customer retention and potential transaction synergies in order to assess their valuation assumptions and provide a specified per share value. *See* Preliminary Proxy at 41. The Preliminary Proxy fails to disclose whether Party 3's offer would have resulted in further employment by Thierer, Parks or other members of Catamaran's senior management. Moreover, by this time, and contrary to statements in the Preliminary Proxy, the Company had already publicly announced the loss of two customers, though it further stated that it had a customer retention rate of 97%.

64.     From February 28, 2015 through March 29, 2015, representatives of Catamaran and Blackstone engaged with representatives of Party 3 to respond to Party 3's due diligence questions and additional informational requests, though Party 3 purportedly raised more antitrust issues than a deal with UnitedHealth. Since it had been in negotiations for months, UnitedHealth completed its diligence and indicating that its best and final offer was $61.50 per share.

65.     On March 21, 2015, Blackstone held a conference call with representatives of Party 3 and requested that Party 3 provide an updated price proposal with an exact per share value by March 24, together with its proposal regarding the reverse break-up fee and a mark-up of Sidley's revised March 21 draft arrangement agreement.

66.     As they were several months behind UnitedHealth, it is not surprising that Party 3 indicated it had remaining due diligence to complete and would not be in a position to submit an updated price proposal or specify an exact per share value by the arbitrarily imposed date of March 24.   The Party 3 representatives indicated that they would require significant additional information from Catamaran to refine their antitrust risk analysis before they would be in a position to provide a proposal regarding the reverse break-up fee or the efforts they would be willing to undertake contractually to obtain required antitrust approvals.   Blackstone requested that Party 3 provide a list of the specific diligence items that Party 3 required in order to update its price proposal.   *See* Preliminary Proxy at 42.

67.     Discussions between representatives of Catamaran and Party 3 continued with Party 3 indicating that it would not be able to respond that quickly to Catamaran's arbitrary timeline given the antitrust issues and purportedly did not want to share its antitrust analysis.

68.     Also on March 25, 2015, Party 2 informed Blackstone that it would not be in a position to submit an indication of interest or mark-up of the Company's initial draft arrangement agreement by the March 25 end of business deadline, but intended to respond to Blackstone on March 26, which Party 2 subsequently did not do.   *See* Preliminary Proxy at 43.

69.     In the evening of March 26, 2015, the Board held a special meeting in Chicago, Illinois, attended by members of management and representatives of Blackstone and Sidley.   The Board discussed the antitrust assessment for UnitedHealth and Party 3 and considered the risk

that a transaction with Party 3 would likely not be completed as quickly as a transaction with UnitedHealth or might not be completed at all—an unremarkable condition since it was months behind UnitedHealth.

70.     After discussions as to the inability of Parties 2 and 3 to be in a position to execute an arrangement agreement shortly, and in light of Blackstone's preliminary fairness analysis, the Board authorized senior management to finalize a transaction with UnitedHealth.

71.     Notably, during the March 26, 2015 meeting, Thierer "informed the Board that representatives of UnitedHealth Group had requested that he serve as Chief Executive Officer of the combined OptumRx/Catamaran company" and "confirmed that, consistent with the Board's direction, he had not had any discussions with UnitedHealth Group or Optum regarding possible post-closing compensation." *See* Preliminary Proxy at 44.  Thereafter, Park was also offered a position with the new company as Chief Operating Officer.

72.     On March 28, 2015, Party 2 notified Blackstone that it would not pursue a possible transaction and withdrew from the process. *See* Preliminary Proxy at 45.

73.     On March 29, 2015, the Board held a telephonic meeting attended by members of management and representatives of Blackstone and Sidley.  During the meeting, Blackstone reviewed with the Board Blackstone's financial analyses of the consideration to be received by the holders of Catamaran's common shares under the Arrangement Agreement and then rendered to the Board its opinion that "the arrangement consideration of $61.50 in cash per common share to be received by the holders of Catamaran's common shares in the arrangement was fair to such holders from a financial point of view." *See* Preliminary Proxy at 45.

**The Preliminary Proxy Is Materially False and Misleading**

74.     Having skewed the limited shop of the Company to favor UnitedHealth, which had months over the other bidders to finalize a bid and was not faced with an onerous draft agreement, and despite the fact that Party 3 was willing to offer substantially more for the Company had it been given an appropriate amount of time to finalize its bid, the Director Defendants now seek to effect the Transaction by way of a materially false and misleading Preliminary Proxy.

75.     The Preliminary Proxy falsely states that on March 5, 2015, a potentially superior bid for the Company made by a party identified only as "Party 3" in the Preliminary Proxy, which made a preliminary bid of between $64.50 to $67.50 per share, did so without knowing about certain client losses (and therefore may not have been pursued at that level).

76.     In fact, on February 26, 2015, the Company held a conference call with analysts in which it specifically stated that the Company had or was going to lose two customers, but that the Company had one of the highest customer retention rates in the industry, indicating that in fact such information was available and Party 3 should have been aware of such information at the time that it made its superior bid, and that any statement otherwise in the Preliminary Proxy is materially false.

**(a) <u>The Preliminary Proxy Fails to Disclose the Company's 2014 EBITDA</u>**

77.     The Preliminary Proxy makes repeated references to the Company's 2014 EBITDA.   It is a key metric in the Blackstone analysis leading to the Fairness Opinion and to various statements in the Preliminary Proxy which would be essential to a voting shareholder, especially in this instance in which they are faced with the option as to whether to vote for the Transaction or exercise their dissenters' rights.   It constitutes one of the bases for the Board's recommendation of the Transaction.

78.     For instance, at page 47 of the Preliminary Proxy, it indicates that one of the bases for the Board's recommendation of the Transaction is that it implies an enterprise value of the Company of $13.6 billion, or a multiple of 16.8 times the Company's EBITDA, but fails to provide the EBITDA amount.

79.     Even more to the point, the summary of the analysis underlying the Fairness Opinion is based in part upon the Company's 2014 EBITDA, but fails to disclose it though it does disclose the Company's estimated EBITDA projections for the period of 2015 to 2019.  The 2014 EBITDA was clearly a metric which was provided to and relied upon by Blackstone, yet it is not disclosed.  *See* Preliminary Proxy at 53 (disclosing only estimated EBITDA for 2015-2019); Preliminary Proxy at 58 (Selected Companies Analysis, applying multiples to Company's 2014 EBITDA but failing to disclose it); Preliminary Proxy at 60 (Selected Precedent Transactions, applying multiples to Company's last twelve months EBITDA).

80.     Disclosure of the 2014 EBITDA used is particularly important in this instance, as Blackstone included in its determination of the Company's 2014 EBITDA the Company's acquisition of Salveo Specialty Pharmacy ("Salveo"), made in March 2015, but did not include its larger acquisition of Healthcare Solutions, Inc. ("Healthcare Solutions"), made in April 2015. Thus, it is impossible for Class Members to understand how Blackstone is calculating the Company's 2014 EBITDA and thus how the value of the Company's shares might be appraised or the real basis for the Board's recommendation of the Transaction.

81.     The Company's 2014 EBITDA, a major metric upon which the Fairness Opinion and the discussion of the multiple to be afforded Class Members, among other things, is a material metric and material information which should have been included in the Preliminary Proxy, and the omission of which makes the Preliminary Proxy materially misleading.

**(b) The Company's Estimated 2015 EBITDA is Materially Deflated**

82.    In order to justify the unfair Transaction price, Blackstone used a materially depressed or deflated 2015 EBITDA, which fails to accurately take into account the Company's its historical growth. This artificially manipulated and depressed estimated EBITDA was used in several of the Blackstone methodologies in support of the "Fairness Opinion." *See, e.g.*, Preliminary Proxy at 53, 58, 60.

83.    The 2015 estimated EBITDA used by Blackstone and disclosed in the Preliminary Proxy is based upon the Company experiencing revenue growth of only 6.2% in 2015. However, the Company experienced historical revenue growth of 46-49% for 2014-3 and 2014 and there is no indication that it would have experienced significantly less organic growth in 2015. In fact, the Company's revenue growth increased 100% in 2012, and had average revenue growth of 63.1% over the past three years.

84.    Revenue increased from $9.9 billion in 2012, to $14.8 billion in 2013, to $21.6 billion in 2014. According to the Company's press release announcing its "RECORD FINANCIAL RESULTS FOR 2014," dated February 26, 2015, PBM revenue increased "due to an increase in the prescription claim volume as a result of organic growth added through new customer implementations as well as additional specialty claim volume."

85.    The management case projection of 6.2% revenue growth in the Preliminary Proxy fails to take into account Catamaran's historical growth rates and its recent acquisitions of Salveo and Healthcare Solutions. Healthcare Solutions closed on April 8, 2015.

86.    Further, the  management case projection disclosed in the Preliminary Proxy of $22.9 billion in revenue for 2015 does not even fall into the revenue range provided for the 2015 full year financial guidance disclosed in the 2014 earnings release. In this regard, the 2014

earnings release disclosed revenue targets of $23.5 to $24.5 billion without considering the "impact from the proposed acquisition of Healthcare Solutions."

### (c) The Preliminary Proxy is Materially Misleading for Additional Reasons

87.     The Preliminary Proxy is additionally false and misleading in that it fails to disclose whether other parties which either bid or were interested in bidding offered both Thierer and Park continued employment and when in the bidding process such employment was offered by UnitedHealth to Thierer and Park;

### (d) The Summary of the Fairness Opinion Omits Material Metrics

88.     The Blackstone Fairness Opinion's Discounted Cash Flow ("DCF") Analysis does not state or indicate: (a) how the terminal values were derived; (b) how the discount rates were determined; and (c) specifically how the number of shares is being determined.

89.     The Blackstone Fairness Opinion's Selected Companies Analysis omits to state material facts, including the following:  (a) the metrics for the selected companies; (b) the identities of the Wall Street analysts relied upon for the information, and the specific industries for which they are analysts; and (c) how Blackstone obtained the representative range of multiples applied to the Company's EBITDA (earnings before interest, taxes, depreciation, and amortization).  Moreover, the Selected Companies Analysis used multiple only for 2014 and 2015 and did not apply the multiples to projected EBITDA despite having projections to 2019.

90.     The Blackstone Fairness Opinion's Selected Precedent Transactions Analysis omits to state material facts, including the following:  (a) the metrics for the selected transactions; (b) how the range of multiples was determined; and (c) the "Company metrics" to which the multiples were applied.

91.     The Blackstone Fairness Opinion's Equity Analyst Price Targets Analysis omits to state material facts, including the following:  (a) the information on which the analysts relied; (b) when the analysts opined; and (c) the industries which the analysts analyze.

92.     The Blackstone Fairness Opinion thus omits to state material facts necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy of the same subject matter which has become false or misleading.

**The Class will be Damaged by the Vote**

93.     Catamaran posted its quarterly earnings results on February 26, 2015. The Company reported $0.67 earnings per share (EPS) for the quarter, beating the analyst consensus estimate of $0.61 by $0.06.   The Company had revenue of $5.74 billion for the quarter, compared to the analyst consensus estimate of $5.57 billion. During the same quarter in the previous year, the Company posted $0.56 earnings per share. Catamaran's revenue for the quarter was up 26.8% on a year-over-year basis.   The Company reported revenues of $21.6 billion for 2014 compared to $14.8 billion in 2013, representing a 46% increase year-over-year.

94.     Analysts expect that Catamaran Corp will post $2.55 EPS for the current fiscal year.

95.     Based on the Company's performance and business prospects, on March 31, 2015 CIBC analysts set a $77.75 per share price target for Catamaran stock and CIBC had a sector outperformer rating on the stock

96.     In a Form 10-Q filed with the SEC on May 4, 2015 ("May 2015 10-Q"), which is incorporated by reference in the Preliminary Proxy, Catamaran announced its quarterly earnings for the three months ended March 31, 2015.  In the May 2015 10-Q, the Company reported that revenue increased 22% to $6.0 billion in Q1 2015, compared to $4.9 billion in Q1 2014.  The

Company reported revenues of $21.6 billion for 2014 compared to $14.8 billion in 2013, representing a 46% increase year-over-year.

97.     In the May 2015 10-Q, the Company reported that gross profit increased 20% to $378.8 million in Q1 2015, compared to $314.7 million in Q1 2014; EBITDA increased 26% to $215.0 million in Q1 2015, compared to $170.9 million in Q1 2014; net income attributable to the Company increased 37% to $86.7 million, or $0.42 per share (fully-diluted) in Q1 2015, compared to $63.4 million, or $0.31 per share (fully-diluted) in Q1 2014; adjusted EPS (fully-diluted) increased 18% to $0.59 in Q1 2015, compared to $0.50 in Q1 2014; and, cash flow from operations increased 8% to $146.7 million in Q1 2015 compared to $135.7 million in Q1 2014.

98.     After disclosure that the Company had entered into the Arrangement Agreement, analysts at Jefferies expressed surprise at Catamaran's decision to sell itself given that the Company was well positioned to gain market share.  Jefferies downgraded Catamaran from "Buy" to "Hold."  After disclosure of the Arrangement Agreement, Mizuho downgraded Catamaran from "Buy" to "Neutral."

99.     These facts demonstrate that the $61.50 per share price under the Transaction does not adequately reflect Catamaran's value, that UnitedHealth is underpaying for Catamaran, and that the Director Defendants failed to maximize shareholder value.

100.    This is further evidenced by the fact the Party 3 was willing to offer materially more, namely between $64.50 to $67.50 per share.

101.    The Preliminary Proxy omits to state these material facts.

## COUNT I

### CLASS CLAIMS AGAINST THE DIRECTOR DEFENDANTS AND CATAMARAN FOR VIOLATIONS OF EXCHANGE ACT SECTION 14(a) AND SEC RULE 14a-9

102.     Plaintiff incorporates and realleges all the allegations contained in the preceding paragraphs as if fully set forth herein.

103.     The contents and the distribution of the Preliminary Proxy have been approved by the Board and thus by each Director Defendant.  See Preliminary Proxy at 123.

104.     Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. §78l]."

105.     SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy or the same meeting or subject matter which has become false or misleading."  17 C.F.R. §240.14a-9(a).

106.     Defendants issued and disseminated the false and misleading Preliminary Proxy which fails to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants will solicited Plaintiff and the Class to vote on the Transaction via a version of the Preliminary Proxy.  A shareholder

vote is required to approve the proposed Transaction. The Preliminary Proxy is an essential causal link to the consummation of the Transaction.

107.    As a result of Defendants' issuance of the Preliminary Proxy containing material misrepresentation(s) and/or omission(s), Plaintiff and the other members of the Class have suffered and will suffer substantial harm.

108.    The facts misrepresented and/or omitted in the Preliminary Proxy are material because under all the circumstances there is a substantial likelihood that a reasonable shareholder would consider these false and misleading statements of fact or omitted facts important in deciding how to vote on the proposed Transaction and would consider these facts a material part of the mix of information available to Plaintiff and the Class in deciding how to vote on the proposed Transaction.

109.    As a direct and proximate result of Defendants' issuance of the false and materially misleading Preliminary Proxy, Plaintiff and the other members of the Class have suffered and will suffer damages in connection with their exchange of stock pursuant to the terms of the proposed Transaction.

110.    By reason of the misconduct alleged herein, Defendants are liable to Plaintiff and the other members of the Class pursuant to §14(a) of the Exchange Act and Rule 14a-9. Defendants have also failed to correct the Proxy and their failure to update and correct the materially false and misleading statements therein violates §14(a) and Rule 14a-9.

111.    The written communications made by the Defendants described herein constitute violations of §14(a) and Rule 14a-9 because such communications are materially misleading, were provided in a negligent manner, will have a direct and clear impact on the voting process, and will impact the outcome of the vote itself on the proposed Transaction.

112.    Defendants' violations of §14(a) and Rule 14a-9 entitle Plaintiff to injunctive relief because Plaintiff and the other members of the Class will suffer irreparable injury absent an injunction in that the shareholder voting procedures have been impermissibly infected, the threatened injury to the moving party outweighs any damage to the opposing party, the injunction, if issued, will not be adverse to the public interest, and a substantial likelihood exists that Plaintiff will prevail on the merits.

## COUNT II

### CLASS CLAIMS AGAINST THE DIRECTOR DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

113.    Plaintiff incorporates and realleges all the allegations contained in the preceding paragraphs as if fully set forth herein.

114.    The Director Defendants acted as controlling persons of Catamaran within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading Preliminary Proxy filed by the Company with the SEC and disseminated to the investing public, the Director Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of various statements in the Preliminary Proxy which Plaintiffs allege are false and misleading.

115.    The Director Defendants were provided with or had access to copies of the Preliminary Proxy alleged by Plaintiff to be false and/or misleading prior to and/or shortly after the Preliminary Proxy was issued and had the ability to prevent the issuance of the false and/or misleading statements therein or cause the statements to be corrected.

116.     In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

117.     As set forth above, the Director Defendants each violated Section 14(a) and Rule 14-9 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Director Defendants are liable pursuant to Section 20(a) of the Exchange Act.

118.     As a direct and proximate result of the Director Defendants' wrongful conduct, Plaintiff and other members of the Class will suffer irreparable harm if a vote is held pursuant to the false and misleading Preliminary Proxy.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.     Declaring this Action to be a proper class action and naming Plaintiff as Class representative;

B.     Preliminarily and permanently enjoining the proposed Transaction or any vote pursuant to a materially misleading proxy;

C.     In the event the proposed Transaction is consummated, rescinding the Transaction and awarding rescissory damages;

D.     Ordering Defendants to pay to Plaintiff and to other members of the Class all damages suffered and to be suffered by them as the result of the acts and transactions alleged herein;

E.     Awarding Plaintiff the costs and disbursements of this action, including allowances for Plaintiff's reasonable attorneys' and experts' fees; and

F.    Granting such other and further relief as may be just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all such issues so triable.

Dated:  May 21, 2015

**LASKY & RIFKIND, LTD**
Norman Rifkind
Amelia S. Newton

_____/s/ Norman Rifkind_____
351 W. Hubbard St., Suite 401
Chicago, IL 60654 US
Telephone:  (312) 634-0057
Fax: (312) 634-0059
rifkind@laskyrifkind.com
newton@laskyrifkind.com

*Local Counsel for Plaintiff*

**THEGRANTLAWFIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
lgrant@grantfirm.com

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax:(212) 279-3655
JAbraham@aftlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION OF LESLIE KATZ

Leslie Katz ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed a copy of the Complaint in this action and authorized its filing.

2.     Plaintiff did not purchase securities of Catamaran Corporation ("Catamaran" or the "Company") at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's transactions in Catamaran securities are set forth in the pages attached hereto as Exhibit A.

5.     In the past three years, Plaintiff has not served, nor sought to serve, as a representative party on behalf of a class in an action filed under the federal securities laws.

6.     Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

_21_   day of May, 2015.

_Leslie Katz_
Leslie Katz


## EXHIBIT A

## Transactions in Catamaran Securities

| Date | Purchase(P)/Sale(S) | Quantity | Price |
|------|---------------------|----------|-------|
| 10/30/2013 | Purchase | 200 | $49.65 |

 **Ameritrade**

**DIVISION OF TD AMERITRADE INC**
**PO BOX 2209**
**OMAHA, NE 68103-2209**

 **SIPC**

**Confirmation Notice**

LESLIE KATZ
40 W 77TH ST
NEW YORK NY 100245128

| Account Number | Other Information | Transaction Number | Capacity Codes | Your Representative | | |
|---|---|---|---|---|---|---|
| 787-521511 - 1 | | 10697312908 | 3 | FF | | |
| **Activity** | **Quantity** | **CUSIP Number** | **Price** | **Principal Amount** | **Misc Fees** | **Reg Fee** |
| YOU BOUGHT | 200 | 148887102 | 49.65 | 9,930.00 | | 0.00 |
| **As of Trade Date** | | **Trade Date** | **Settlement Date** | **Interest** | **Commission/Fee** | **Net Amount** |
| | | 10/30/2013 | 11/04/2013 | | 9.99 | 9,939.99 |
| **Symbol** | | **Trade Description** | | | | |
| CTRX | | CATAMARAN CORPORATION COM | | | | |

**THIS IS AN UNSOLICITED TRADE**

**TRADING APPS FROM TD AMERITRADE. DOWNLOAD TODAY! www.tdameritrade.com/mobileapp**

## CERTIFICATION OF LESLIE KATZ

Leslie Katz ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a copy of the Complaint in this action and authorized its filing.

2.  Plaintiff did not purchase securities of Catamaran Corporation ("Catamaran" or the "Company") at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff owns _200_ shares of Catamaran common stock which he has owned continuously since prior to the time that the relevant transaction was announced..

5.  In the past three years, Plaintiff has not served, nor sought to serve, as a representative party on behalf of a class in an action filed under the federal securities laws.

6.  Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _21_ day of May, 2015.

_____
Leslie Katz